UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHANE M. MOMMAERTS,

    Plaintiff,

  v.                                                    Case No. 23-CV-1248-SCD

MARTIN J. O'MALLEY,
  *Commissioner of the Social Security Administration*,

    Defendant.

## DECISION AND ORDER

      Shane Mommaerts applied for Social Security disability benefits based on various physical and mental impairments, including bipolar disorder. Relying on testimony from a vocational expert, an administrative law judge denied the claim for benefits, finding that, despite his fluctuating bipolar symptoms, Mommaerts could still perform certain jobs that existed in significant numbers in the national economy. Mommaerts seeks judicial review of that decision, arguing that the ALJ failed to account for all his bipolar symptoms and erred in relying on the vocational expert's testimony. Because the ALJ failed to ensure that the vocational expert's job number estimates were the product of a reliable method, substantial evidence does not support her finding that a significant number of jobs exist in the national economy that Mommaerts could still perform. Accordingly, I will reverse the decision denying Mommaerts disability benefits and remand the matter for further proceedings.

## BACKGROUND

      In 2020, Mommaerts applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, claiming that he was

disabled and unable to work due to various impairments, including bipolar disorder. R. 97, 234–50, 253–75.[1] Mommaerts was diagnosed with bipolar disorder when he was sixteen years old. R. 375, 403, 433–34, 571–72, 1090. He suffers from both type I and type II, which means that sometimes he has severe highs (mania), while other times his highs are less severe (hypomania); he also experiences depressive episodes. R. 233, 370–71, 377, 380–82, 390–91, 396, 434, 445, 524, 529, 571, 746. Mommaerts alleged episodes where he stays up multiple nights in a row and then crashes and can't get out of bed. *See* R. 268, 312, 571, 586, 593. He says these episodes have resulted in him being fired from nearly every job he has had for missing too many workdays.

The state agency charged with reviewing the applications on behalf of the Social Security Administration denied Mommaerts' claim initially and upon his request for reconsideration. *See* R. 58–93. The reviewing psychologists found that Mommaerts' bipolar disorder did not significantly limit his mental abilities. R. 61–62, 70–71, 79–80, 88–89. Relevant here, they found that Mommaerts had only a moderate limitation in his ability to concentrate, persist, or maintain pace.

After the state agency denial, Mommaerts had a hearing before an ALJ. *See* R. 12–57. Mommaerts, who was represented by counsel at the hearing, testified that he previously worked as a finish carpenter, a landscaper, and a roofer. *See* R. 19–20. However, he said he was fired from his last two jobs for missing too much work due to his health issues. Mommaerts told the ALJ that he was not completely incapable of working; rather, he said his bipolar disorder caused frequent highs where he wouldn't sleep for days, followed by

---

[1] The transcript is filed on the docket at ECF No. 10-2 to 10-12.

crashes during which he'd sleep most of the day. R. 27–28. Mommaerts indicated that, at his last job, he missed at least one day of work each week because of his bipolar symptoms.

Edward Pagella testified at the hearing as a vocational expert. *See* R. 47–56. Pagella testified that a hypothetical person with Mommaerts' vocational profile could not perform any of his past relevant jobs if he were limited to a restricted range of light exertional work. R. 47–49. That person could, however, perform such jobs as a packer, a routing clerk, an assembler, an inspector, or a bagger. R. 62. Pagella estimated that, within the national economy, there were over 110,000 sedentary packer jobs; over 130,000 assembler jobs; over 78,000 inspector jobs; and over 130,000 bagger jobs. When questioned about his methodology for determining the jobs and numbers available, Pagella explained it was based on his "education, training, and experience, as well as information from the United States Department of Labor and U.S. Census Bureau of Statistics which is utilized through SkillTRAN and OccuBrowse Pro." R. 50.[2]

Mommaerts' lawyer then attempted to probe further into Pagella's methodology. The lawyer first asked Pagella how he used SkillTRAN to get his numbers. Pagella responded, "I'm not here to train you, Counselor. If you have a hypothetical question, I go through training in order to learn how to perform, going through OccuBrowse Pro. It is available to the general public which you're more than welcome to purchase." R. 50. The ALJ tried to clarify the question, asking Pagella if he used the raw numbers from SkillTRAN or if he modified them. R. 50–51. Pagella said he "put the information into the program . . . and obtain[ed] full-time positions for the numbers." R. 51. In other words, he did not deviate from

---

[2] "SkillTRAN is a software producer, which produces a variety of programs for vocational professionals, such as Job Browser Pro and Occubrowse." *Frasier v. Comm'r of Soc. Sec.*, No. 1:23-cv-00133-SLC, 2024 WL 1327309, 2024 U.S. Dist. LEXIS 56160, at *13 n.7 (N.D. Ind. Mar. 27, 2024).

3

the estimates the program provided. Mommaerts' lawyer asked for more specifics, and the following exchange occurred:

> LAWYER: So, your methodology is to listen to the Court's hypothetical, come up with a DOT code that's consistent with that hypothetical, and then you plug that DOT code into the SKillTRAN program, is that correct?
>
> PAGELLA: I'm not sure I understand your questioning.
>
> LAWYER: Okay. I'm asking you about . . .
>
> PAGELLA: I've been doing this for 33-plus years and for me to sit here and explain, you know, the training and process that I've gone through, you can look at my CV. I utilize SkillTRAN in order to obtain our numbers and plug in that information, as you just indicated. And if you have a hypothetical question which I was retained to do per my contract, I'll be happy to answer the question.

R. 51.

Mommaerts' lawyer objected to Pagella's methodology and, given his responses, asked the ALJ to take over the questioning. R. 51–52. The ALJ explained that Pagella did not need to divulge the technical details of the software. R. 52. However, he noted that, in previous cases, vocational experts have described a process in which they made modifications to the numbers provided by the program they relied upon. Pagella said the jobs he provided were within the ALJ's hypothetical and, in his opinion, the numbers from SkillTRAN did not need to be modified. R. 52–53. Pagella indicated he believed those numbers were reliable given his 33 years of experience performing job placement services (including for those with disabilities), as well as his extensive experience testifying for the Social Security Administration and the Railroad Retirement Board. R. 53.

Mommaerts' lawyer asked Pagella to explain how his experience informed his estimate for the bagger job. R. 53. Pagella said he had personally observed more than 120 individuals bagging product at a local Amazon plant and had witnessed workers assembling cell phones

4

at Motorola and packaging hot dogs for Kosher Foods. R. 53–54. The lawyer asked how those observations got him to the 130,000 estimate he provided for the bagger job. Pagella said it was based on the information he plugged into SkillTRAN and his experience in seeing the position being performed. R. 54–55. Pagella later clarified that he believed the estimates provided by SkillTRAN were reliable in light of his knowledge of jobs that exist in the economy and how they're performed. R. 55–56. He acknowledged that, because there is no way to calculate an exact number of jobs available, SkillTRAN provided an approximation. R. 56.

In February 2023, the ALJ issued a written decision finding that Mommaerts was not disabled. *See* R. 94–114. He considered the disability applications under 20 C.F.R. §§ 404.1520(a) and 416.920(a), which set forth a five-step process for evaluating DIB and SSI claims. *See* R. 97–109. At step one, the ALJ determined that Mommaerts had not engaged in substantial gainful activity since his alleged onset of disability. R. 99. The ALJ determined at steps two and three that Mommaerts' bipolar disorder was a severe, but not presumptively disabling, impairment. R. 100–02. He specifically found that Mommaerts had a moderate limitation in his ability to concentrate, persist, or maintain pace.

Prior to step four, the ALJ assessed Mommaerts' residual functional capacity—that is, the most he could do despite his physical and mental limitations, *see* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ determined that Mommaerts had the mental ability to understand, remember, and carry out simple instructions; required regular work duties and expectations with occasional changes; could occasionally interact with coworkers and supervisors; and could never interact with the public. R. 103. In arriving at that RFC, the ALJ considered Mommaerts' subjective allegations, the objective medical evidence, and the medical opinion

5

evidence. R. 103–07. The ALJ determined at step four that Mommaerts could not perform any of his past relevant work. R. 107.

At step five, the Social Security Administration "bears the burden of demonstrating that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations." *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022) (per curiam) (citing 20 C.F.R. § 416.960(c)(2)); *see also* 20 C.F.R. § 404.1560(c)(2). Relying on the vocational expert's testimony, the ALJ determined that, in spite of his limitations, Mommaerts could still work as an assembler, an inspector, and a packer. R. 107–09. The ALJ also relied on the vocational expert's testimony to conclude that those jobs existed in significant numbers in the economy, meaning Mommaerts was not disabled.

The ALJ explained why she found Pagella's testimony to be reliable. R. 108–09. According to the ALJ, Pagella cogently and thoroughly answered the questions asked at the administrative hearing and offered a persuasive description of the resources he relied upon and the methodology he used to approximate the job numbers. R. 108–09. The ALJ also noted that Pagella relied on his research, training, consultation with peers, and experience placing individuals in jobs. Finally, the ALJ indicated that Mommaerts' lawyer failed to establish that Pagella's methodology was inconsistent with agency rules, regulations, or policy. The ALJ therefore overruled Mommaerts' objection to Pagella's testimony.

The Social Security Administration's Appeals Council subsequently denied Mommaerts' request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

In September 2023, Mommaerts filed this action seeking judicial review of the Commissioner's decision denying his claims for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 6, 7, 8. Mommaerts filed a brief in support of his disability claims, ECF No. 12; the Commissioner filed a brief in support of the ALJ's decision, ECF No. 20; and Mommaerts filed a reply brief, ECF No. 23.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the

7

Case 1:23-cv-01248-SCD   Filed 06/20/24   Page 7 of 18   Document 24

claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Mommaerts contends that the ALJ failed to account for all his bipolar symptoms and that substantial evidence does not support the ALJ's step-five finding.

## I. The ALJ Did Not Reversibly Err in Evaluating Mommaerts' Bipolar Symptoms

Mommaerts first argues that the ALJ did not account for the limitations stemming from his bipolar disorder. He accuses the ALJ of ignoring evidence of hypomania and associated crashes and not building a logical bridge between the evidence she did cite and the assessed mental RFC. According to Mommaerts, his bipolar episodes impacted not only his concentration, but also his ability to persist and maintain pace. As support, he points to statements he made to treatment providers describing these cycles, as well as his hearing testimony that sometimes he stays up for days during a manic episode, while during a depressive episode he sleeps for nearly an entire day.

Substantial evidence supports the ALJ's evaluation of Mommaerts' ability to concentrate, persist, and maintain pace. No doctor opined that Mommaerts had *any* limitations in that functional domain. Indeed, the non-examining psychologists who reviewed Mommaerts' treatment records found that his mental impairments did not significantly limit his mental abilities. *See* R. 61–62, 70–71, 79–80, 88–89. The ALJ deemed those findings unpersuasive, concluding that the record supported greater limitations, including a moderate limitation in his ability to concentrate, persist, or maintain pace. R. 102, 106. But all that means is that Mommaerts' functioning in that domain independently, appropriately,

8

effectively, and on a sustained basis was "fair." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(F)(2)(c). "'[F]air' in ordinary usage does not mean 'bad' or 'inadequate.'" *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021). So a moderate limitation does not always result in a corresponding limitation that must be incorporated into the RFC assessment.

Moreover, the ALJ cited substantial evidence supporting the severity of the assessed limitation. The ALJ noted that, although Mommaerts reported difficulties concentrating, completing tasks, following instructions, and focusing, he also reported engaging in several activities—including driving, preparing meals, watching television, and handling his own medical care—that required some degree of concentration, persistence, and pace. R. 102 (citing Exhibit 3E). The ALJ also noted that Mommaerts presented as engaged with intact attention and concentration and normal thought content during his mental status examinations. R. 102 (citing Exhibit 16F). Mommaerts does not challenge the severity of his functioning, conceding that the ALJ's assessed mental RFC is not "facially deficient." Pl.'s Br. 15.[3]

The only evidence Mommaerts cites to support a limitation in persistence or pace is his own subjective statements; however, the ALJ reasonably determined that the record did not fully substantiate Mommaerts' allegations of disabling symptoms. The ALJ observed that, despite his bipolar diagnosis, Mommaerts exhibited relatively good mental functioning during his mental status exams. R. 105 (citing Exhibits 2F; 5F–7F; 9F; 11F–17F). The ALJ also observed that Mommaerts' symptoms improved with treatment and that he made good progress in individual therapy. R. 105 (citing Exhibit 5F and Hearing testimony). And the ALJ noted that Mommaerts remained capable of engaging in a wide range of activities,

---

[3] Citations are to the page numbers provided by ECF, not the page numbers at the bottom of Mommaerts' brief.

including tending to his own personal care needs, taking care of his daughter, going to the park with his daughter, umpiring, playing golf, playing games with his daughter, preparing some meals, doing some housework, driving, shopping, reading, biking, landscaping, woodworking, fishing, hunting, watching television, handling his own medical care, and attending medical appointments. R. 106 (citing Exhibits 3E; 6E; 6F; 14F; and Hearing testimony).

Mommaerts has not shown that the ALJ's evaluation of his subjective allegations was patently wrong. *See Hess v. O'Malley*, 92 F.4th 671, 679 (7th Cir. 2024) (noting that reviewing courts "will overturn the ALJ's evaluation of a claimant's subjective symptoms only if it is 'patently wrong, which means that the decision lacks any explanation or support'") (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). He accuses the ALJ of ignoring evidence of his hypomania and bipolar crashes. However, the ALJ noted that Mommaerts testified he missed work too often due to not being able to get out of bed related to bipolar symptoms. R. 103 (citing Hearing testimony). The ALJ therefore did not ignore an entire line of evidence contrary to her conclusion. *See Jones*, 623 F.3d at 1162 ("The ALJ need not, however, discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability."). Moreover, contrary to Mommaerts' suggestion, the evidence he claims the ALJ ignored does not reflect "extreme highs and lows." Pl.'s Reply 8 (citing R. 377, 644, 746, 758, 858, 868, 1309, 1441, 1443, 1465). As Mommaerts acknowledges, he usually reported episodes of hypomania—that is, a less severe form of mania. *See, e.g.*, R. 377, 641, 644, 746, 763, 946, 1535. The record contains very few instances of more severe bipolar symptoms, and Mommaerts references only one. *See, e.g.*, R. 1535 (reporting an "awful" mood—more depressed but no manic or hypomanic symptoms).

10

Relatedly, Mommaerts takes issue with the ALJ's reliance on the mental status exams, suggesting that such exams do not capture the symptoms of bipolar disorder. That's somewhat true. The fact that Mommaerts was alert and oriented, had good eye contact, and exhibited good judgment during his psychiatric appointments perhaps revealed little about how he could function on a day-to-day basis in the workplace. But those exams also assessed Mommaerts' mood and affect. If Mommaerts did indeed experience significant mood swings, it would be reasonable to expect he would have exhibited more variance in his mood during his appointments. However, as noted above, he almost always presented with only mild bipolar symptoms, and he rarely reported more severe symptoms.

Mommaerts also says that most of his improvement related to his ADHD, not his bipolar disorder. Although it's true that most of the records the ALJ cited related to ADHD, she did cite one progress note in which Mommaerts reported that his bipolar mediation was helping with his mood. *See* R. 405. The ALJ could have cited others. *See, e.g.*, R. 396 (doctor assessing Mommaerts' bipolar disorder in partial remission in October 2020); R. 501 (Mommaerts reporting more stable mood and no longer feeling manic); R. 763 (Mommaerts voluntarily stopped taking his bipolar medication in January 2022 and reported never feeling better); R. 1441 (Mommaerts reporting that he was tolerating his bipolar medication well, stating "I am the best I have ever been"); R. 1463 (Mommaerts reporting that his bipolar medication was quite helpful for stabilizing his mood). Notably, Mommaerts cites only one example of worsening bipolar symptoms during the relevant period, and even that potential exacerbation didn't persist.

Finally, Mommaerts says the ALJ failed to explain how his daily activities undercut his allegations. He points out that, given the cyclical nature of bipolar disorder, it's

11

unsurprising—and largely irrelevant—that he was sometimes able to drive, shop, read, and attend appointments. Mommaerts has a point. The fact that he was able to engage in those activities while his mood was stable or during a less severe manic or depressive episode says little about his ability to work on a sustained basis. Nevertheless, the ALJ here did not overly rely on Mommaerts' daily activities, and she provided several other, valid reasons for not fully crediting Mommaerts' alleged disabling bipolar symptoms. *See Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018) (finding that one misplaced reason does not "make the ALJ's overarching credibility determination 'patently wrong'").

Even if the ALJ erred in assessing Mommaerts' bipolar symptoms, any error was harmless. Mommaerts does not identify any work restrictions that were supported by the record and that would account for his alleged persistence and pace limitations. He says that "he needs more persistence and pace," but he doesn't explain what that means or hypothesize any specific limitation. *See* Pl.'s Reply 12. He also cites to his hearing testimony, where he described periods of manic episodes followed by depressive crashes. However, it's unclear from that limited testimony that Mommaerts would be unable to keep up in the workplace. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("It is unclear what kinds of work restrictions might address [the claimant's] limitations in concentration, persistence, or pace because he hypothesizes none.").

In sum, the ALJ did not reversibly err in assessing Mommaerts' bipolar symptoms.

## II. Substantial Evidence Does Not Support the ALJ's Step-Five Finding

Mommaerts also argues that substantial evidence does not support the ALJ's step-five finding because the vocational expert failed to establish that his job number estimates were the product of a reliable method.

Case 1:23-cv-01248-SCD    Filed 06/20/24    Page 12 of 18    Document 24

"The substantial evidence standard 'is not high' and requires only enough 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Fetting v. Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023) (quoting *Brace v. Saul*, 970 F.3d 818, 821 (7th Cir. 2020)). "When the ALJ bases his decision on the testimony of a [vocational expert], substantial evidence requires that the ALJ 'ensure that the approximation is the product of a reliable method.'" *Id.* "A methodology is reliable when it is based on 'well-accepted' sources and the vocational expert explains her methodology 'cogently and thoroughly.'" *Ruenger*, 23 F.4th at 763 (quoting *Biestek*, 139 S. Ct. at 1155). "And when, as here, the claimant challenges the job-number estimate, the ALJ must compel the vocational expert to offer a 'reasoned and principled explanation' of the methodology [he] used to produce the estimate.'" *Id.* (quoting *Chavez v. Berryhill*, 895 F.3d 962, 970 (7th Cir. 2018) (*Chavez I*)). "The expert's explanation must be sufficient to instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Id.* (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).

The vocational expert testified that there were hundreds of thousands of jobs in the national economy that someone with Mommaerts' vocational profile and RFC could perform, and he said he obtained his job number estimates from a commercially available software program. R. 47–50. Mommaerts accuses the vocational expert of not adjusting his estimates for full- or part-time work or for non-exertional limitations not considered by the *Dictionary of Occupational Titles* (*DOT*).[4] He also criticizes the vocational expert for not explaining how the software worked, for not following the software's operating instructions, and for not describing how his training and experience informed his estimates. According to

---

[4] The *DOT* is "a publication produced by the Department of Labor that lists job titles and their requirements." *Ruenger*, 23 F.4th at 761.

Mommaerts, the ALJ also failed to sufficiently investigate the vocational expert's methodology and ensure it was reliable.

Substantial evidence does not support the ALJ's reliance on the testimony the vocational expert provided in this case. First, it's unclear whether the vocational expert based his methodology on well-accepted sources. Social security regulations authorize the agency to "take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. §§ 404.1566(d), 416.966(d) (providing a non-exhaustive list of accepted sources). The vocational expert here said he obtained his job number estimates from SkillTRAN's OccuBrowse Pro software. R. 50. SkillTRAN produces a variety of different programs, including OccuBrowse, Job Browser Pro, and OASYS. *See* SkillTRAN, https://www.skilltran.com/index.php (last visited June 20, 2024). The company, however, does not appear to offer a product called OccuBrowse Pro. A search of common legal research databases turned up only one case mentioning OccuBrowse Pro, but the court in that case clearly meant to say OccuBrowse Plus—a product SkillTRAN no longer offers. *See Rose G. v. Acting Comm'r of Soc. Sec.*, No. 22-cv-05597-TLF, 2023 WL 2136526, 2023 U.S. Dist. LEXIS 28660, at *4–5 (W.D. Wash. Feb. 21, 2023) (correctly referencing OccuBrowse Plus earlier in the decision); *see also* SkillTRAN → Products → PC-Based Solutions → OccuBrowse +, https://skilltran.com/index.php/products/pc-based-solutions/occubrowse-plus (last visited June 20, 2024). Although it's possible that the vocational expert merely misspoke, precision is crucial in this case, as the vocational expert said he relied exclusively on the software's numbers. It remains unknown, however, which source he consulted. Also, unlike in previous cases this court has seen, the vocational expert here did not testify that the software he consulted was widely used in the industry, much less explain why that is so. *Cf. Miller v.*

14

*O'Malley*, No. 23-CV-116-SCD, 2024 WL 770754, 2024 U.S. Dist. LEXIS 36598, at *7–8 (E.D. Wis. Feb. 13, 2024) (finding methodology based on a well-accepted source where the vocational expert testified that the software he consulted—SkillTRAN's Job Browser Pro— was widely used by vocational experts in social security proceedings, as well as professionals in other settings).

Second, the vocational expert's explanation of his methodology was neither cogent nor thorough. He initially told the ALJ that he based his methodology on the SkillTRAN software and his education, training, and experience. *See* R. 50. However, he offered no details on what that process entailed, and when Mommaerts' lawyer tried to probe further, the vocational expert became defiant, saying he didn't need to train the lawyer on his process and that the software was publicly available (insinuating that the lawyer could figure it out on his own dime). *Id.* The vocational expert then admitted that he merely "put the information into the program." R. 51. When Mommaerts' lawyer attempted to find out what information he input, the vocational expert claimed that he didn't understand the question and suggested that his thirty-three years of experience and curriculum vitae spoke for itself. *Id.* This is exactly the type of black box treatment the Seventh Circuit has deemed problematic. *See, e.g.*, *Ruenger*, 23 F.4th at 763–64 (finding that an ALJ erred in relying on a vocational expert who obscured the origin of her job estimates and failed to justify her use of the equal distribution method); *Brace*, 970 F.3d at 822–23 (finding that an ALJ erred in relying on a vocational expert who arrived at his job number estimates using the "information that [he had]" and "an allocation based upon weighting or re-weighting those allocations").

Third, the vocational expert did not sufficiently explain why he had confidence in the numbers produced by the SkillTRAN software. The vocational expert admitted that he took

15

the raw numbers from the program—that is, without any modifications. R. 50–51, 55. However, the vocational expert did not explain what information he put into the program, and he refused to explain (or perhaps didn't know) how the program works. The vocational expert also did not explain how the program solves the matching problem between DOT Codes and SOC codes.[5] The Seventh Circuit has indicated that "a vocational expert is not required to explain the statistical basis for the sources on which [he] relies." *Chavez v. O'Malley*, 96 F.4th 1016, 1024–25 (7th Cir. 2024) (*Chavez II*); *see also Case*, 2023 U.S. App. LEXIS 19693, at *8–9 ("The inability of the vocational expert to precisely explain the software's algorithms does not render his explanation unreliable."). But in *Chavez II* the claimant's counsel declined the vocational expert's offer to provide details about the program's underlying methodology, and in both *Chavez II* and *Case* the vocational experts explained how the SkillTRAN program they used resolved the matching problem between *DOT* Codes and SOC Codes. *See Chavez II*, 96 F.4th at 1025–26; *Case*, 2023 U.S. App. LEXIS 19693, at *7–9. Neither happened in our case.

The Commissioner insists that the vocational expert also evaluated the SkillTRAN numbers in light of his experience. According to the Seventh Circuit, a vocational expert's job number testimony may be reliable if buttressed by the expert's credentials and expertise. *See Chavez II*, 96 F.4th at 1023–24; *see also Hohman v. Kijakazi*, 72 F.4th 248, 254 (7th Cir. 2023). The vocational expert here indicated that he had thirty-three years of experience in performing job placement services and that he relied on that experience when assessing the

---

[5] Because the *DOT* does not provide job number estimates, vocational experts often rely on the United States Bureau of Labor Statistics' Occupational Employment Statistics (OES). "OES, however, uses a different classification system from DOT called Standard Occupational Codes (SOC)." *Case v. Kijakazi*, No. 22-2379, 2023 WL 4882880, 2023 U.S. App. LEXIS 19693, at *4 n.1 (7th Cir. Aug. 1, 2023) (citing *Chavez I*, 895 F.3d at 965–66). Thus, there's a matching problem between DOT Codes and OES data. *See id.* at *4 n.1, 7–8.

numbers SkillTRAN provided. *See* R. 52–56. When asked how his experience gave him confidence in the estimate he provided for the bagger job (supposedly over 130,000 positions available in the national economy), the vocational expert said he'd previously observed 120 individuals bagging product at an Amazon plant. R. 49, 53. However, the vocational expert did not explain how he extrapolated that observation to the national economy. It's also unclear whether those Amazon packers were performing the same bagger job the vocational expert offered in response to the ALJ's hypothetical, as that job appears limited to bagging clothing. *See* R. 49 (listing DOT Code 920.687-018).[6] Because the vocational expert's testimony about his experience did not support the examples he provided, that experience cannot serve as the foundation for relying exclusively on the SkillTRAN estimates.

Finally, the ALJ did not sufficiently explain why he overruled Mommaerts' objection to the vocational expert's testimony. She said the vocational expert cogently and thoroughly answered the questions posed by Mommaerts' lawyer; the expert, however, refused to answer most of the lawyer's questions and claimed not to understand the others, even though they were straightforward questions typically asked in social security hearings. She said the vocational expert consulted with peers; the expert said no such thing. And she said Mommaerts' lawyer failed to establish that the vocational expert's approach was inconsistent with agency rules, regulations, or policy; however, that was the agency's burden, not Mommaerts'.

---

[6] The vocational expert also said he'd observed workers assembling cell phones and packaging food. R. 53–54. But Mommaerts' attorney asked specifically about the bagger job, and those jobs appear different from the jobs the vocational expert listed at the hearing. *See* R. 48–49 (listing DOT Code 559.687-074 (plastic product inspector and packager), DOT Code 732.684-062 (fishing reel assembler), DOT Code 669.687-014 (dowel inspector), and DOT Code 559.687-014 (pharmaceutical ampoule sealer)). It's not clear those other jobs exist in significant numbers in the national economy. *Cf. Chavez II*, 96 F.4th at 1023 (indicating that jobs like cleaner, officer helper, and storage rental clerk are clearly prevalent within the national economy).

In sum, the ALJ failed to ensure that the vocational expert's job number estimates were the product of a reliable method. Substantial evidence therefore does not support the ALJ's finding that there are a significant number of jobs in the national economy that Mommaerts could perform, notwithstanding his limitations.

## CONCLUSION

For all the foregoing reasons, I find that substantial evidence does not support the ALJ's step-five finding. Thus, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 20th day of June, 2024.

_____
STEPHEN C. DRIES
United States Magistrate Judge